Naples v. Hays, Chief of Police, et al.

*Thomas & Kiebort,* for plaintiff; *Stewart A. Culbertson,* for defendants.

KENT, P. J., Sept. 10, 1928.—This is an action of replevin brought by the plaintiff against the said named defendants to recover possession of a certain Mills Front O. K. Mint Vending Machine, seized and taken from plaintiff's place of business by the defendants, acting in their respective official capacities, alleging that said machine was a gambling device and prohibited under the laws of the Commonwealth of Pennsylvania, and now comes before the court upon stipulation and agreement of counsel, waiving the right of trial by a jury, the right of appeal and establishing the facts and circumstances involved in this controversy, asking the court to determine the question as to whether said machine can legally be operated according to instructions contained thereon without violating the laws of Pennsylvania relative to gambling devices.

The facts agreed upon in this case as set forth in the stipulation filed are: That the plaintiff, Tony Naples, a resident of the City of Meadville, Crawford County, Pennsylvania, with his place of business situate on Water Street, in said city, on or about April 17, 1928, placed in his said place of business, as lessee, one Mills Front O. K. Mint Vending Machine, fully equipped with mints and checks for its public operation; that on said date John L. Laley, County Detective of Crawford County, and L. M. Hays, Chief of Police of the City of Meadville, Crawford County, acting in their respective official capacities, entered the said plaintiff's place of business and took into their possession the said Mills Front O. K. Mint Vending Machine, alleging that the same was a gambling device and prohibited under the laws of the Commonwealth. A few days thereafter, the plaintiff filed in this case his præcipe for a writ of replevin for the said named machine, fixing the value thereof, by affidavit attached to the said præcipe, at $150, filing his, plaintiff's, replevin bond in the sum of $300, as required by law. Whereupon Stewart A. Culbertson, District Attorney of Crawford County, acting voluntarily, appeared for the defendants, waived the issuing of the writ, and accepted service thereof on behalf of the defendants with the same force and effect as though the writ had been regularly issued by the prothonotary and served by the Sheriff of Crawford County; that the correct description and explanation of the operation of the said machine as agreed to is as follows: It is a machine known as the Mills Front O. K. Mint Vending Machine, and has for its purpose the vending of mints. At the top of the machine is a slot or cylinder hole in

which a five-cent piece or trade check is deposited, which, with the assistance of the person depositing the same, opens the machine to complete the operation, by means of a lever situate on the right-hand side thereof to be pulled forward. When this operation is completed, that is, the depositing of the five-cent piece or trade check in the slot and the operator pulling the lever forward, a package of mints is delivered for the operator at the lower part of the machine. Every person depositing a nickel or trade check in the machine gets a package of mints, and there are no blanks. If the said machine should not contain mints, the nickel or trade check deposited by the operator in the slot is returned to him by the machine, thereby making it impossible for any operator to give up his five-cent piece or trade check without receiving in return therefor a package of mints. At the top and in the front of the said machine is a window which is visible to the operator at all times. This machine is so constructed that in this window is shown just what the operator will receive for his five-cent piece or trade check deposited therein. If "no" shows in this window, the operator will receive nothing in addition to the package of mints. At times this window shows a number which may vary from 2 to 20, these numbers being visible to the customer at each time before the nickel or trade check is placed in the slot, providing the window does not show the word "no." The machine is so constructed that in its operation, when a number appears in this window, the next operator of the machine, either the initial operator or some other person who deposits a nickel or trade check in the slot of the machine and completes the operation as above described, will receive, in addition to the package of mints, the number of trade checks that is shown in the said window. Thus, if the figure "5" appears in the window, the operator will receive the package of mints and, in addition thereto, five trade checks, the number of trade checks varying from 2 to 20, according to the designated number shown in the window. Thus, the operator may receive, in addition to the package of mints, from 2 to 20 trade checks, which may be used by the operator either in playing the machine, each check being good for one turn or operation of the said machine, or redeemable in 5 cents' worth of merchandise over the counter of the person possessing the said machine. And, further, there is printed on the front of the machine, at the left, the following instructions: "Your nickel buys a package of Jennings Mints, the Nations Quality Mints, and the number of premium coupons shown in this window," and at the right, "Try a package of Jennings Mints, wrapped clean and vended fresh. Premium coupons should be traded in for merchandise, as merchant will not vend mints for coupons."

The plaintiff contends that the said machine is not a gambling device the use of which is prohibited under the laws of the Commonwealth of Pennsylvania. The defendants contending that it is a gambling device and cannot legally be operated under the laws of the Commonwealth of Pennsylvania.

From the facts agreed upon the sole question for the court to determine is whether or not the (slot) machine mentioned and described in the stipulation is a gambling device or device of address or hazard under the laws of the State of Pennsylvania, the stipulation also providing that if the court be of the opinion that the machine can be legally operated without violating any law prohibiting gambling devices, then the judgment is to be in favor of the plaintiff and the machine returned to him and the costs incident to the proceedings to be paid by defendants. If the court be of the opinion that the machine is a gambling device and cannot be legally operated according to the instructions on the machine without violating the laws relating to gambling

devices, then the decision of the court is to be in favor of the defendants, and they are to retain the machine, subject to the further instructions of the court as to its final disposition, and the plaintiff shall pay the costs necessarily incident to this proceeding.

Section 55 of the Act of March 31, 1860, P. L. 382, as amended by the Act of March 26, 1923, P. L. 32, provides: "If any person shall set up or establish, or cause to be set up or established, either in the open or in any house, room, out-house, tent, booth, arbor or other place whatsoever, any game or device of address, or hazard, with cards, dice, billiard balls, shuffle boards or any other instrument, article or thing whatsoever, heretofore or which hereafter may be invented, used and employed, at which money or other valuable thing may or shall be played for, or staked or abetted upon; or if any person shall procure, permit, suffer and allow persons to collect and assemble in his house, room, out-house, booth, tent, arbor or other place whatsoever, under his control, for the purpose of playing at and staking or betting upon such game or device of address, or hazard, money or other valuable thing; or if any person being the owner, tenant, lessee or occupant of any house, room, out-house, tent, booth, arbor or other place whatsoever, shall lease, hire or rent the same, or any part thereof, to be used and occupied or employed for the purpose of playing at or staking and betting upon such game or device of address, or hazard, for money or other valuable thing, the person so offending in either of the enumerated cases shall be guilty of a misdemeanor."

Gaming under this act means: The act of a person who puts up money or other valuable thing upon the chance of the happening of something unknown to the player, through which the player will get money or other valuable thing, or even a chance to get money or other valuable thing for less than it cost.

From the agreed description and explanation of the operation of said machine, it clearly appears that the player or operator of the machine described puts up or deposits in the machine money or checks of value, first, for the purpose of getting mints or checks, and, second, upon the chance of the happening of something unknown to the player through which, by an additional payment, he could get more than he paid for; there being no limitation as to the number of times a single operator may play or operate the said machine.

Upon the argument of this case, we were referred to no Pennsylvania cases deciding the questions involved in this matter, but we were referred to decisions of foreign courts deciding that like machines were gambling devices and games of address or hazard as defined and prohibited by the Pennsylvania statute.

In the case of State of Rhode Island v. Certain Gambling Instruments, etc., Rhode Island Supreme Court, 128 Atl. Repr. 12, it is held that:

A mint vending machine so constructed and loaded as to be readily used for gambling purposes by delivering according to chance, which is indicated in advance, checks redeemable in goods, in addition to mint of the value of the deposited coin, and permitted to be so used, may be condemned as a gambling device, notwithstanding a rule to the effect that customers will not be permitted to make consecutive purchases and an agreement by the storekeeper to see that it is not so used. Rathbun, J., in delivering the opinion of the court, says: "This is a proceeding in rem to have a certain nickel in the slot-machine declared forfeited to the state in accordance with the provisions of chapter 410, Gen. Laws, 1923. . . . The owner designates the instrument in question as a mint vending machine. Its operation may be briefly described as follows: By depositing a nickel coin in a slot, pulling a lever and turning a

knob, the operator receives from the machine one package of mints, and, if lucky, brass checks varying in number from 2 to 20, redeemable at 5 cents each in trade at the store where the machine is located. For each nickel deposited in the slot the machine delivers to the operator a package of mints to the retail value of 5 cents. In each instance the machine indicates in advance whether or not the operator will, by that particular operation, receive any checks in addition to the package of mints and, if so, how many. It is contended by the owner that the element of chance is eliminated because the operator always knows in advance what he will receive for the nickel he deposits, but the operator knows, also, that after the expenditure of a nickel in operating the machine the indicator may show that a like expenditure of another nickel may bring, in addition to another package of mints, as many as twenty checks. The chance that the second play will give something for nothing is, apparently, a very strong appeal to the gambling instinct, as the owner testified that the machine would sell a thousand times as many mints as could be sold over the counter. On the machine is a printed notice containing a rule to the effect that customers will not be permitted to make consecutive purchases, and in an instrument purporting to be an agreement between the owner and the proprietor of the store from which the machine was taken is a clause whereby said proprietor agrees to "see" that customers do not use the machine for gambling purposes or in violation of the above rule.

"Two persons, by alternate playing, might operate the machine indefinitely without violating said rule. It would be practically impossible for a storekeeper to watch the machine every time it is operated, even if it should be assumed that he would be willing to limit his own profits and those of the owner and honestly desires to prevent consecutive playing by the same person, but we are very strongly of the opinion that the rule is a mere subterfuge, made use of in an attempt to evade the law. However, the question of intent is unimportant, as this is a proceeding, not against the owner but against the machine. The questions are whether the machine is so constructed that it may be used as a gambling instrument and whether it was being so used in the store where the machine was seized. It is clear that the machine was so constructed and loaded with packages of mints and with brass checks that it was capable of being used as a gambling instrument. . . . It appearing that the machine was so constructed and loaded as to be readily used for gambling purposes and that it was permitted to be so used, we have no hesitation in finding that said machine is a gambling instrument."

In our opinion, the machine described in this case and the machine described in the case at bar are identical in construction and means of operation and the reasoning of the court therein very applicable to the case at bar.

It seems to be generally held by the courts of other jurisdictions that "a slot vending machine which, in return for a coin deposited therein, dispenses merchandise of the value of such coin, accompanied at occasional and uncertain intervals by a varying amount of money, trade checks or coupons, is a gambling device:" Allen v. Com., 178 Ky. 250; Com. v. Gritten, 180 Ky. 446; State v. May, 186 N. C. 470; People v. Nahmias, 146 N. Y. Supp. 856; Ferguson v. State of Indiana, 99 N. E. Repr. 806.

In the case of State v. Googin, 117 Me. 102, 102 Atl. Repr. 970, it was held that: A gum vending machine which indicated in advance that, in return for a nickel deposited therein, it would discharge either a five-cent package of gum alone or the gum and a certain number of five-cent trade checks, was a gambling device. The court said: "Respondent says the gum-machine involves no element of chance; that each play of the machine is a completed trans-

action and shows precisely what the player is to receive and what the machine is to give; that there is no contract, express or implied, that the player shall have a second or third play to avail himself of the opportunity of obtaining the trade checks; that, this being so, there is no element of chance. But the fallacy of this contention is found in the assumption that the machine deals with the individual, whereas, by its method of operation, of necessity, it deals with the public. It is an automatic device, the operation of which is planned in every detail before it is put in use. It is then placed in public places to be automatically worked. It is the dumb agent of its owner, inviting the public to operate it as often and as many times as any one of the public may please. We find no limitation upon the right of the same person to operate over and over again. It is undoubtedly this unlimited right that allures the patronage that makes the operation of the machine profitable. If the player does not win the first time, he knows he can repeat till he does win. It is, therefore, quite apparent that it is the prize, and not the gum, that invites the public. Accordingly, while each play is a completed act, it may be only preliminary to the future play by the same person which will bring forth the coveted prize, the chance in this operation being not in the visible play, which may show only a package of gum, but in the invisible play by which the machine may turn up a visible prize to be captured on the next play. If a play turns up no premium, neither party loses. If it does turn up a premium, then the machine loses on that particular play. But it is said there is no loss to the machine in the end and consequently no chance because the machine has calculated the profits and losses beforehand and set apart a certain part of the profits to be allowed its customers. True, but not to all customers alike. Some get something; some get nothing; some more; some less. In this lies the test of what this device means, and the theory upon which it is conceived and worked, namely, to induce customers to play the machine with the expectation of getting something for nothing, it matters not what customer is successful, as it is perfectly obvious that one part of the public pays in money for what another part of the public gets in prizes. In other words, this machine is a device designed to play one part of the public against another part of the public for the purpose of inducing the whole public to take the chance of gain, which in the end results in producing to its owner the predetermined profits. It is also claimed that this device is in the nature of a profit-sharing enterprise or similar in its purpose to the practice of department stores in offering premiums to the departments showing the largest increase of profits. But a department store does not take profits from one part of its customers or employees with which to pay premiums to another part. No one set of customers is predestined to pay an extra price for the purpose of contributing funds for the payment of awards. But the owner of this machine, in advance, takes money of one part of the public and gives it to another part whose winnings depend upon the chance, arranged in advance, of just when and just how much a certain play of the machine will produce to the player who is lucky enough to approach it at the moment of the predestined play. If he then draws twenty checks valued at 5 cents each, he wins, in addition to his gum, $1. Another may win ten checks, another five; an inequality of value probably running through the whole list of prizes. This transaction cannot be regarded as a 'profit-sharing' enterprise, as we understand the phrase, nor a legitimate distribution of premiums for services rendered, as in the case of department stores."

Upon the argument of the case at bar, attorney for the plaintiff strenuously contended that each play of the machine was a complete transaction, but

very frankly admitted that a continuous playing of the machine would, in all probability, be considered gaming. In this case, as in the case just quoted, there is no limitation upon the right of the same person to operate over and over again the machine, and thereby eventually bringing forth the coveted prize to be captured on the next play.

In the case of Pure Mint Co. *v.* Labarre, N. J. Eq., 125 Atl. 105, it is said: After pointing out that the element of chance entered into the transaction with regard to the number of checks which the machine, after the completion of the first operation, would offer for the next, the court said: "Complainant argues that the machine must needs be considered solely from the standpoint of a single separate operation, and that no customer has any right to a second operation, or to continue to operate it. It may well be that the customer has no such definite, technical, legal right; doubtless, as a matter of law, the shopkeeper would have a lawful right to refuse to permit a customer to operate the machine a second time in succession, just as he might lawfully refuse to sell a loaf of bread or a cigar to an intending purchaser. But it is not pretended that any shopkeeper having one of these machines ever has refused to permit a second successive operation, or is ever likely to so do. The machine itself bears no announcement of any such limitation; and the only reason which can be conceived for the devising and manufacture of such a machine is that the lure of the chance of gains on a second operation will induce, or help to induce, the first operation. . . . Suppose a customer of one of the machines in question having once operated the machine, receiving only the package of mint and no premium checks, sees that if he operates it again he will get five or ten premium checks. No shopkeeper, unless intent on commercial suicide, would conceivably refuse to permit him to operate it a second time; and any bystander who attempted to displace the first customer would inevitably bring on a breach of the peace. It is also argued that the machine is not a gambling device, because there is no possibility of loss to the customer; because for each nickel deposited he invariably receives his five-cent package of mints whether he receives any premium checks or not. This contention is not sound. The statute makes no such differentiation. It is just as much a playing for valuable things (premium checks) whether the candy is delivered or not; the difference is in degree, but not in kind."

In the case of State *v.* McTeer, 129 Tenn. 535, and 167 S. W. Repr. 121, the court said: "It is insisted that the indicator always shows what the player is to get before he deposits his nickel; hence, it is said there is no element of uncertainty and no opportunity of obtaining disproportionate gains or sustaining loss by the hazard of anything of value. It is true there is no hazard of loss, if we assume, as we think we should, that each package of gum is of the fair commercial equivalent of 5 cents; but there is the prospect of obtaining very greatly disproportionate gains. The indicator may show a package of gum when the player deposits his nickel, and this he will get when he works the lever, but at the same time the indicator may present for the next play either one of the numbers representing checks of the value of 5 cents each. If, for example, the number shown is 20, the player, by depositing 5 cents, will obtain twenty checks worth $1. So for the other numbers. The lure is the opportunity of winning from 10 to 100 cents by the deposit and expenditure of 5 cents. There must be at least one play before any of the numbers mentioned is shown on the indicator, and there may be many, and it is not known which number will appear, nor at what time, nor after how many plays. In case the checks are shown on the indicator, the owner of the machine stands to lose on that play the difference between

5 cents and the denomination of the check which the machine may show; that is, a loss of from 5 cents to 95 cents. However, there is always a chance that any single player, by the expenditure of 10 cents, through making two plays of 5 cents each, may obtain not only a package of gum worth 5 cents, but checks worth from 10 to 100 cents, and so in proportion for many plays and a corresponding loss to the owner of the machine on such individual deals. The player is induced to continue by the fact that he is getting 5 cents' worth of gum for each play, with always the chance just ahead that the next presentation of the indicator will give him the opportunity of making a profit of from 100 to many times that per cent. We think this shows the machine is a gambling device. It is not essential that there should be the chance of loss to the players, as well as of extraordinary or greatly disproportionate gain."

It has been held in a great number of other jurisdictions that mint or gum vending machines, commonly known as slot-machines, identical with or very similar to the machine involved in this case, are gambling devices. We have been unable to find any decision of the appellate courts of this State upon the question submitted for our determination, but we do find one case reported, that of Com. v. Jones and Nicely, 15 Pa. Justices' Law Repr. 1, from the Court of Quarter Sessions of Lycoming County, in which Whitehead, P. J., in his opinion, says:

"For many years governments, both national and municipal, have recognized the great danger, especially to the young, of gambling, every game, sport or pastime in which chance for gain is the controlling element, and statutes, acts and ordinances have been enacted to suppress the same. All games in which there is a chance or possibility of getting much for little seems to have such a seductive influence that to those who indulge in playing them much injury results.

"It is well known that this social evil, if allowed to go unrestricted, would result in the impoverishment of many and lead to the commission of crimes, and to prevent such a condition is the object and purpose of these statutes relating to gambling. Since the enactment of these statutes, many crafty and ingenious persons have endeavored, through ingenious games, devices and instruments, to accomplish the same results as have been condemned, but in such a way as to keep within the law.

"The machine used by the defendants in the case are unquestionably ingeniously arranged so as to attract the young and sometimes the old, because of the possibility of getting more than is shown upon the face of the machine. Keeping in mind the fact that the indicator points to what one will get, and that one is sure to get the thing indicated, and also keeping in mind that when one drops the nickel in to get the gum or check indicated by the indicator, that the indicator immediately changes and points to the same or something else, and that this gives one the opportunity, upon depositing another nickel or check, to get from one to twenty checks, each worth 5 cents in merchandise, are we not irresistibly led to the conclusion that the player is operating for two purposes, viz.: First, to get the thing indicated; and, second, the opportunity to get very much more than the thing indicated, namely, twenty checks."

The chief element of gambling is the chance or uncertainty of the hazard. It is not essential that one of the parties to the wager stands to lose. The chance taken by the player may be in winning on the operation of the machine, or in the amount to be won or lost, and the transaction should be denounced as gambling whenever the player hazards his money on the chance

that he may receive in return money or property of greater value than that he hazards. If he is offered the uncertain chance of getting something for nothing, the offer is a wager, since the operator offers to bet that the player will lose, and in accepting the chance the player bets that he will win. Such offer, therefore, is a direct appeal to the gambling instinct, which, it is said, possesses every man in some degree, and it is the temptation to gratify the instinct that all penal laws aimed at gambling are designed to suppress.

One cannot imagine that a player would stop when the indicator pointed at trade checks, at a certainty of gain. Consequently, the inventor of this machine knew that when each new player began, the indicator invariably would point to mints only, and he also knew that in the vast majority of instances the dealings between the player and the machine would consist of more than a single play.

Wherefore, we believe and hold as unsound the view and argument of the plaintiff that each play constituted a separate and distinct transaction in the sense of ending the relation of the player to the machine. In our opinion, this machine is so constructed that in its operation it will allure the player into continuing to play in the hope that at the next turn of the machine the indicator would indicate that he would receive, in addition to the package of mints, trade checks, varying in number from 2 to 20, of the value of 5 cents each, and thus bring him something for nothing.

Applying the reasoning of the above-quoted cases, and considering the construction and operation of the machine in the case at bar, we are convinced that the machine in question is a gambling device, and that the setting up and operating of same would be in violation of the laws of this Commonwealth.

Wherefore, now, Sept. 10, 1928, in accordance with the agreement of counsel, judgment is hereby entered in favor of the defendants, and it is ordered that said named officers, the defendants, destroy that certain Mills Front O. K. Mint Vending Machine, taken from the premises of the said plaintiff on April 17, 1928, and it is further ordered that the plaintiff, Tony Naples, pay the costs of this proceeding.

From J. Perry Eckels, Meadville, Pa.